UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

James Sloman, on behalf of himself
and all others similarly situated

        v.                              No. 06-cv-377-JD
                                        Opinion No. 2007 DNH 115

Presstek, Inc., Edward J. Marino,
and Moosa E. Moosa

O R D E R

James Sloman brings this putative class action seeking
damages for alleged violations of the securities fraud provisions
of the Securities Exchange Act of 1934 (the "Exchange Act").  The
putative class consists of all persons who purchased Presstek,
Inc. common stock from July 27, 2006, to September 28, 2006.  The
defendants are Presstek, a Delaware corporation with its
principal place of business in Hudson, New Hampshire, Presstek's
former President and Chief Executive Officer, Edward J. Marino,
and Presstek's former Executive Vice President and Chief
Financial Officer, Moosa E. Moosa.  The defendants move to
dismiss the amended class action complaint, and Sloman objects.

## I.  Background

On a motion to dismiss, the facts are recited as alleged in
the complaint.  Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d

92, 94 (1st Cir. 2007).  The court also considers Presstek press releases dated July 27, 2006, and September 29, 2006, which were attached to the defendants' motion to dismiss and to the defendants' reply to Sloman's objection to the motion to dismiss respectively.  See Diva's Inc. v. City of Bangor, 411 F.3d 30, 38 (1st Cir. 2005) (in the context of a motion to dismiss, a court may consider extrinsic documents when their authenticity is undisputed and the complaint is dependent upon the document).

Presstek describes itself as a "leading manufacturer and marketer of high tech digital imaging solutions for the graphic arts and laser imaging markets."  At all times relevant to the amended complaint, defendant Marino was Presstek's President and Chief Executive Officer ("CEO") and defendant Moosa was Presstek's Executive Vice President and Chief Financial Officer ("CFO").  Presstek promoted itself as a growth company based on its cutting-edge commercial printing technology, which included two digital product lines:  (1) a "Direct Imaging" system, by which digital images are transferred directly onto printing plates, and (2) a computer-to-plate ("CtP") system that uses digital technology to place an image on a chemistry-free printing plate.

Presstek's most recent CtP innovation, the Vector TX52, was introduced in the fourth quarter of 2005.[1]  In a December 2005 press release, Marino touted the strong "customer response" to the Vector TX52 as being one of two "leading indicators" of Presstek's success in the digital printing market.  Marino also stated that he expected the Vector TX52 would be "at full production by the end of the first quarter of 2006."

Presstek continued to issue favorable press releases about the growth of its digital products in 2006.  One recurring theme was Presstek's strategy to phase-out its older analog products while simultaneously focusing on increasing the penetration of its digital products.  In a January 2006 press release, Presstek announced favorable preliminary financial results for the fourth quarter of 2005.  Moosa attributed the company's gains to "the positive result of the changes in strategy and tactics taken in the previous quarter."  Marino was quoted as stating that "[r]ecord digital equipment sales in the quarter reflect . . . . the strength of our digital technology product lines, as well as the market's acceptance of those products."  The press release also noted that the company had "ramped up production of its

---

[1]Presstek's fiscal year runs concurrently with the calendar year, so the fourth quarter runs from October to the end of December.

Vector TX52 CtP product."  An April 2006 press release reported
record revenue and operating profit for the first quarter of
2006.  Marino again attributed the company's success to "growth
in our digital product lines" and to having "increased the
penetration of Pressteks' digital technology products."  Marino
stated that sales of digital equipment had grown "more than 8% on
a sequential quarter basis, and more than 30% when compared to
the first quarter of last year."  He added that Presstek
"anticipate[d] continued solid business performance in 2006"
based, in part, on "new product offerings."

    Three Presstek communications in particular are crucial to
Sloman's claims.  The first was a July 27, 2006, press release
reporting record Presstek financial performance for the second
quarter of 2006 –– consolidated revenue of $74.2 million, up 10%
from the prior quarter and 24% from the corresponding quarter of
the previous year, and net income of $2.7 million.  Among other
things, Marino was quoted as stating that "[g]rowth of the
company's consolidated revenue was driven by strong digital
sales, which now comprise 69% of total revenue," that "[w]e
believe that the strong growth trends developing in our digital
product lines clearly demonstrate growing market acceptance of
Presstek's digital technology[,]" and that "[t]he penetration of
Presstek's digital technology continues to be the driving force

4

behind our growth plans."  Moosa was also quoted in the press release.  Among other things, Moosa noted the company's expectation that margins would "improve in the coming quarters as analog service contracts are replaced by service contracts on newly installed digital products."  The press release ended with a section entitled "Looking ahead," in which Marino stated that "we expect third quarter revenue to be roughly equal to the second quarter due to the normal seasonality of our business. For the year, we believe we are on track to achieve our annual revenue growth target of 10% in 2006."

The second important Presstek communication came on September 28, 2006, two days before the close of the third quarter.  Presstek gave a presentation at the Nobel Financial ONTRACK 2006 Small Cap Conference/Microcap Symposium, which was also broadcast on the internet.  Presstek's Director of Investor Relations, Robert Lammey, reiterated Marino's expectation that Presstek would meet its goal of 10% revenue growth for the year 2006.  That same day, Presstek stock opened at a price of $7.75 per share and quickly rose to $7.90 per share.  By late morning, however, Presstek stock began to decline sharply, ultimately closing the day at $6.23 per share (a 20% decline for the day). The volume of trading that day, 2,142,600 shares, was unusually

high.  The previous high for trading volume that month was
326,300 shares on September 15.

The third important communication came at 12:05 a.m. the
next day, September 29, 2006.  Presstek issued a press release
disclosing the preliminary financial results for the third
quarter.  The press release stated that third quarter revenues
were $65–$66 million, which was well below the company's previous
expectation that Presstek's third quarter revenues would roughly
match the second quarter revenues of $74.2 million.  Marino
acknowledged that, although "we expect to have a better quarter
in Q4, . . . based on the current trends, we do not expect to
realize the anticipated 10% growth in consolidated revenues this
year."

Marino cited four reasons (hereafter referred to
collectively as the "four unfavorable revenue factors") for the
"disappointing" third quarter results:  (1) an approximately $2.5
million revenue shortfall due to softness in analog sales; (2) a
$3.5 million decline over the previous quarter due to delays in
the timing of certain equipment transactions, which was partially
attributable to the greater–than–expected impact of the Graph
Expo Trade Show in October 2006; (3) a $1 million reduction in
revenues due to manufacturing problems with Presstek's Vector
TX52, which had caused Presstek to "effectively stop[] sales of

[the] Vector CTP product in the third quarter until we got our arms around certain manufacturing issues"; and (4) a $1 million shortfall in "DI plate sales [that] were down in the quarter primarily due to a lowering of inventory by major OEM partners." Several hours after that press release was issued, Presstek held an 8:30 a.m. conference call with investors.  When questioned about Presstek's revenue projection from the previous day's presentation,  Marino acknowledged that it was "incorrect," but noted that "we corrected it last night in the release."

Presstek's stock price continued its dive on September 29. Presstek shares opened at $4.95, down another 20% from the $6.23 closing price on September 28.  Again, there was extraordinary volume of 3,797,600 Presstek shares traded on September 29. Several unidentified internet postings on September 29 speculated that the previous day's heavy trading and 20% price decline were attributable to selective leaks by Presstek management concerning the adverse financial information that was not released to the general public until just past midnight.

An October 25, 2006, press release confirmed that Presstek's third quarter revenues were just under $65 million, and that the company had a net loss of $423,000 for the quarter.  The press release disclosed that third quarter revenues from CtP systems -- including the Vector TX52 -- declined by approximately $2 million

7

from the previous quarter.  On January 18, 2007, Presstek issued
a press release announcing preliminary revenue results for the
fourth quarter, with expected revenue equaling just under $66
million.

In October of 2006, Sloman filed a complaint on behalf of
himself and the putative class alleging violations of the
Exchange Act.  After the defendants moved to dismiss, Sloman
filed an amended complaint.  The amended complaint alleges that
the defendants violated sections 10(b) and 20(a) of the Exchange
Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 of the
Securities and Exchange Commission ("SEC") regulations, 17 C.F.R.
§ 240.10b-5, by knowingly issuing, or causing to be issued, false
or misleading statements.  Sloman alleges that the plaintiff
class, in reliance on the defendants' false statements, purchased
Presstek common stock at artificially inflated prices, and that
they were damaged "when the price of Presstek stock fell when the
true facts were disclosed on September 28-29, 2006."  The amended
complaint seeks damages from Presstek and from Marino and Moosa
as individuals.

The defendants move to dismiss the amended complaint for
failure to state a claim upon which relief can be granted under
Rule 12(b)(6) of the Federal Rules of Civil Procedure, and for
failure to plead the allegations of fraud with the particularity

8

required by the Private Securities Litigation Reform Act of 1995
("PSLRA"), 15 U.S.C. § 78u-4.

## II.  Discussion

The defendants challenge Sloman's amended complaint on
several grounds.  First, the defendants argue that the PSLRA's
safe harbor provisions shield them from liability arising from
the forward-looking July 27 and September 28 communications.
Second, they argue that the amended complaint must be dismissed
because it fails to identify with particularity the basis for
Sloman's "information and belief" that the defendants' statements
were false or misleading.   Third, the defendants argue that the
amended complaint fails to raise the strong inference of scienter
required to state a claim under section 10(b).  Fourth, the
defendants argue that Sloman has not alleged facts sufficient to
establish loss causation -- i.e., that his losses are
attributable to the defendants' alleged misrepresentations.
Finally, the defendants argue that, since Sloman's section 10(b)
claim cannot succeed, neither can his derivative section 20(a)
claim.  Alternatively, the defendants argue that Sloman's section
20(a) claim fails because he has not sufficiently pled that the
individual defendants, Marino and Moosa, were "control persons."

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  In turn, Rule 10b-5, outlaws, inter alia, making any "untrue statement of a material fact," or omitting to "state a material fact necessary in order to make the statements made . . . not misleading," or engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  There are six elements for a securities fraud claim under section 10(b):  "(1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  Ezra Charitable Trust v. Tyco Int'l, Ltd., 466 F.3d 1, 6 (1st Cir. 2006) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

Section 20(a) "asserts the liability of persons exercising control for violations of law by a controlled entity."  In re Stone & Webster, Inc., Secs. Litig., 414 F.3d 187, 194 (1st Cir. 2005).  The elements of a section 20(a) claim are "(I) an

10

underlying violation of the same chapter of the securities laws
by the controlled entity, . . . and (ii) control of the primary
violator by the defendant." Id.

Two aspects of the PSLRA are at issue here:  the "safe
harbor" provisions for "forward-looking statements," and the
heightened pleading standard. See Tellabs, Inc. v. Makor Issues
& Rights, Ltd., --- U.S. ---, 127 S. Ct. 2499, 2508 (2007).
Under the heightened pleading standard, a section 10(b) complaint
must "(1) 'specify each statement alleged to have been misleading
[and] the reason or reasons why the statement is misleading,' . .
.; and (2) 'state with particularity facts giving rise to a
strong inference that the defendant acted with the required state
of mind[.]'" Id. (quoting 15 U.S.C. § 78u-4(b)(1), (b)(2)).
Although the PSLRA imposes heightened pleading requirements, the
usual motion to dismiss standard applies:  the court takes as
true all well-pleaded factual allegations and draws all
reasonable inferences therefrom in the plaintiff's favor, Ezra,
466 F.3d at 5-6; Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78
(1st Cir. 2002), but is free to "disregard bald assertions,
unsupportable conclusions, and opprobrious epithets." In re
Credit Suisse First Boston Corp., 431 F.3d 36, 45 (1st Cir.
2005).

11

## A.  The Safe Harbor Provision

The defendants argue that, even if the July 27 and September
28 communications contained false or misleading statements, the
safe harbor provisions of the PSLRA shield the defendants from
liability because the statements were forward-looking
projections.  See 15 U.S.C. § 78u-5(c)(1).  They argue that both
communications were "accompanied by meaningful cautionary
statements identifying important factors that could cause actual
results to differ materially from those in the forward-looking
statement."  Id. § 78u-5(c)(1)(A)(I); Greebel v. FTP Software,
Inc., 194 F.3d 185, 201 (1st Cir. 1999) (noting that the first
safe harbor provision "shelters forward-looking statements that
are accompanied by meaningful cautionary statements").[2]  See also

---

[2]The July 27 press release ended with the following
statement:

"Safe Harbor" Statement under the Private Securities
Litigation Reform Act of 1995:  Certain statements
contained in this New Release constitute "forward-
looking statements" within the meaning of the Private
Securities Litigation Reform Act of 1995, including
statements regarding expectations regarding future
growth and profitability; expectations regarding the
sale of products in general; expected expansion of
served markets; expected organic and strategic growth;
expected benefits and market acceptance of new product
introductions; and the ability of the company to
achieve its stated objectives.  Such forward-looking
statements involve a number of known and unknown risks,
uncertainties and other factors which may cause the

15 U.S.C. § 78u-5(c)(2) (concerning oral forward-looking statements).  Additionally, the defendants argue that the amended complaint only alleges that the defendants should have known about the four unfavorable revenue factors when they made the allegedly misleading communications, not that they had "actual knowledge" that the statements were false or misleading.  15 U.S.C. § 78u-5(c)(1)(B); Greebel, 194 F.3d at 201 (noting that the second safe harbor provision "focuses on the state of mind of the defendant and precludes liability for a forward-looking

---

actual results, performance or achievements of the company to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.  Such factors include, but are not limited to, market acceptance of and demand for the company's products and resulting revenue; the ability of the company to meet its stated financial objectives, the company's dependency on its strategic partners (both on manufacturing and distribution), and other risks detailed in the company's Annual Report on Form 10-K and the company's other reports on file with the Securities and Exchange Commission.  The words "looking forward," "looking ahead," "believe(s)," "should," "may," "expect(s)," "anticipate(s)," "likely," "opportunity," and similar expressions, among others, identify forward-looking statements.  Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date the statement was made.  The company undertakes no obligation to update any forward-looking statements contained in this news release.

statement unless the maker of the statement had actual knowledge it was false or misleading").

Under First Circuit law, when a court considers whether a statement is covered by the safe harbor provisions, it "must examine which aspects of the statement are alleged to be false." Stone & Webster, 414 F.3d at 213.  When the statement in question blends forward-looking representations with representations concerning present circumstances, the mere reference to future projections is not sufficient to invoke the safe harbor "if the allegation of falsehood relates to [the] non-forward-looking aspects of the statement."  Id.

Although Sloman's allegation that the defendants' repeatedly represented throughout the first half of 2006 that they expected Presstek to enjoy 10% growth in revenues for the year is relevant to his claims, it is not the focus of his lawsuit.  Sloman's claims of fraud are focused on the defendants' omissions concerning present facts rather than on their affirmative projections about the future.  Cf. id. (noting that the plaintiff's claim of fraud concerned the defendants' representation about its present access to funds, not its underestimation about its future cash needs).  Sloman's securities fraud claim would be much weaker had the defendants disclosed the four unfavorable revenue factors in the July 27

14

press release, even if they had persisted in projecting 10%
growth for the year notwithstanding those factors.  Here,
however, the alleged fraud springs primarily from the omission of
material information, from both the July 27 press release and the
September 28 presentation, about present or recently occurring
circumstances.  Cf. In re Tycom Ltd. Secs. Litig., Nos. 03-cv-
1352, 02-MDL-1335, 2005 WL 2127674, at *8 (D.N.H. 2005).

It makes no difference that the alleged misrepresentation in
this case was an omission rather than an affirmative statement.
Rule 10b-5 prohibits both false statements of material facts and
omissions of material fact where the omitted facts are "necessary
in order to make the statements made, in light of the
circumstances under which they were made, not misleading."  17
C.F.R. § 240.10b-5(b).  See also Aldridge, 284 F.3d at 81-82
(finding sufficient factual support for the plaintiff's
securities fraud claim where the plaintiff alleged that the
defendants had delayed the disclosure of certain material
contingencies); Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26
(1st Cir. 1987) ("When a corporation does make disclosure--
whether it be voluntary or required--there is a duty to make it
complete and accurate.").

**B.  Pleading Fraud**

The defendants next argue that the amended complaint must be dismissed because it fails to identify with particularity the basis for Sloman's "information and belief" that the defendants' statements were false or misleading.  Because the amended complaint does not cite any witnesses or any internal documents, the defendants argue that it provides no basis, other than Sloman's unsubstantiated information and belief, to question the accuracy of Presstek's revenue projections at the time they were made.

To properly plead a section 10(b) claim under the PSLRA's heightened standard, the plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement . . . is made on information and belief, . . . state with particularity all facts on which that belief is formed." Credit Suisse, 431 F.3d at 46 (quoting 15 U.S.C. § 78u–4(b)(1)). The complaint "must provide factual support for the claim that the statements . . . were fraudulent, that is, facts that show exactly why the statements . . . were misleading." Id. (quoting Aldridge, 284 F.3d at 78).

The court notes at the outset that the defendants do not claim that Sloman failed to sufficiently identify the allegedly

misleading statements or the reasons why they were misleading.
It is undisputed that Sloman's claims are based on the July 27
press release and September 28 presentation.  As described above,
Sloman alleges that those two communications were misleading
because they failed to disclose the four unfavorable revenue
factors that were subsequently disclosed in Presstek's September
29 press release.  The defendants do not argue that these factors
were immaterial.

The primary thrust of the defendants' argument is that
Sloman's claims are not based on any internal sources at
Presstek, such as a whistle blower from within the company or a
"smoking gun" internal document.  But neither the plain language
of section 10(b), nor the interpretive case law, require such
sources for an actionable claim.  To the contrary, because
circumstances differ widely from case to case, the First Circuit
has "shied away from attempting to compile a mechanical checklist
of the type and kind of allegations that are essential to satisfy
the PSLRA pleading requirements."  Id.; see also In re: Cabletron
Sys., Inc., 311 F.3d 11, 32 (1st Cir. 2002) ("Each securities
fraud complaint must be analyzed on its own facts; . . . .
Sufficient evidence of one type might reduce or eliminate the
need for evidence in other categories, without thwarting the
legislative intent behind the PSLRA.").

Sloman's amended complaint, albeit lacking an internal informant or a "smoking gun" document, relies on a number of sources, among them statements from:  Presstek's website, Presstek's SEC filings, Presstek's September 28 internet presentation, Presstek's September 29 investor conference call, and several Presstek press releases, including the July 27 and September 29 press releases.  It would be improper to reject such sources as categorically insufficient.  Rather, the court must make "an individualized assessment that sweeps before it the totality of the facts" pled in this case.  <u>Credit Suisse</u>, 431 F.3d at 46.

The amended complaint alleges that Marino admitted, during the September 29 conference call, that the presentation the previous day provided false information about Presstek's financial situation.  From those allegations, a reasonable inference may be drawn that the September 28 presentation was misleading.  <u>See</u> <u>Aldridge</u>, 284 F.3d at 79 (holding that, based on the language of company disclosures in 1999, it would be reasonable to infer that statements made in 1998 by the defendants had omitted material information).  As described in more detail below in the scienter discussion, <u>see</u> <u>infra</u> Part II.C., language in the September 29 press release also strongly suggests that the defendants knew about the four unfavorable

18

revenue factors before September 28.  Although it is less clear
whether the amended complaint establishes that the information
relayed in the July 27 press release was false at the time of its
publication, Sloman only needs to establish one false or
misleading statement of material fact to maintain his section
10(b) claim.  Giving Sloman's amended complaint "the benefit of
all reasonable inferences," Aldridge, 284 F.3d at 79, he
adequately pleads that Presstek issued a misleading statement to
its investors on September 28.

## C.  Pleading Scienter

The defendants contend that the amended complaint fails to
state with particularity facts which give rise to a "strong
inference" of scienter.  The defendants characterize Sloman's
amended complaint as pleading nothing more than "fraud by
hindsight."

Under the PSLRA's heightened pleading standard, the
plaintiff must "state with particularity facts giving rise to a
strong inference that the defendant acted with the required state
of mind."  15 U.S.C. § 78u–4(b)(2).  On a section 10(b) claim,
the required state of mind is "scienter," which the Supreme Court
has defined as "a mental state embracing intent to deceive,
manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S.

185, 193 & n.12 (1976).  In the First Circuit, a plaintiff may plead scienter by alleging either that the "defendants consciously intended to defraud, or that they acted with a high degree of recklessness."  Ezra, 466 F.3d at 6.  Crucial to this case is the meaning of "strong inference" for the purpose of establishing scienter.  The Supreme Court recently clarified the meaning of that phrase and outlined the preferred methodology for examining a complaint to determine whether it complies with the PSLRA's heightened pleading standard.  See Tellabs, 127 S. Ct. at 2508–2510.

The Tellabs decision provides three instructions for a court considering a Rule 12(b)(6) motion to dismiss a section 10(b) action.  First, the reviewing court "must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."  Id. at 2509.  Second, the court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Id.  The third instruction concerns how a court should approach the "strong inference" requirement.

20

Under the old First Circuit standard, the inference of scienter had to be the strongest of all competing plausible inferences.  See Credit Suisse, 431 F.3d at 49 ("Scienter allegations do not pass the 'strong inference' test when, viewed in the light of the complaint as a whole, there are legitimate explanations for the behavior that are equally convincing."). The Supreme Court essentially charted a middle ground, rejecting the Seventh Circuit's permissive approach, see Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 602 (7th Cir. 2006), but also eschewing the strict approach previously applied by the First Circuit.  The Tellabs decision vindicates the First Circuit's approach of viewing the complaint holistically and then taking into account the competing plausible inferences.  See Tellabs, 127 S. Ct. at 2510.  Under the Tellabs test, however, once a court has considered the plausible opposing inferences, a "complaint will survive, . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.  Thus, a court may not grant a motion to dismiss for failure to plead facts establishing scienter if, viewing the complaint as a whole, the inference of scienter is at least as compelling as any "nonculpable explanations for the defendant's conduct."  Id. In other words, a tie now goes to the plaintiff.

21

As argued by the parties, two plausible inferences arise from the juxtaposition of the September 28 investor presentation and the September 29 press release that contradicted the presentation's advice concerning Presstek's outlook for the second half of 2006.  The inference advocated by the defendants is that they realized, after the September 28 presentation, that they had provided investors with old information that was no longer current and that they acted quickly to update Presstek's status with the September 29 press release.  The inference advocated by Sloman is that the defendants purposefully or recklessly delayed the disclosure of bad news until September 29.

The defendants point out that neither of the individually named defendants are alleged to have participated in the September 28 presentation.  According to the amended complaint, it was Presstek's Director of Investor Relations, Robert Lammey, who communicated the company's financial outlook.  The defendants argue that there is no allegation that Lammey knew about the four unfavorable revenue factors, and that the defendants endeavored to quickly correct Lammey's mistaken statements within hours of their delivery.  The defendants argue that their prompt corrective press release negates rather than supports an inference of scienter.

22

At the motion to dismiss stage, the court credits Sloman's
assertion that Lammey, as the Director of Investor Relations, had
the authority to make statements on behalf of Presstek.  See
Cabletron, 311 F.3d at 35–36 & n.12 (attributing statements from
executives and other company personnel to the company); Aldridge,
284 F.3d at 80 n.3 (holding that, on a motion to dismiss, there
was a "strong inference that a Director of Marketing had
authority" to make statements on behalf of the company).  For
similar reasons, the statements made by Lammey during the
investor presentation are also attributable to Marino and Moosa,
Presstek's CEO and CFO respectively.  See infra Part II.E.
(finding that the amended complaint sufficiently pleads that the
individual defendants were "control persons"); cf. In re
StockerYale Secs. Litig., 453 F. Supp. 2d 345, 357–58 (D.N.H.
2006) (attributing press releases to the company and its senior
executives).  See also In re Tyco Intn'l, Ltd., Nos. MDL 02–1335–
B, 02–266–B, 2004 WL 2348315, at *2 (D.N.H. 2004) (noting that
the "group pleading" doctrine, which, in certain circumstances,
attributes company statements to its officers, survived the PSLRA
to the extent that the "facts of the case make it reasonable to
apply the doctrine in the way that plaintiffs propose").

Although the amended complaint does not allege that Lammey
was aware of the issues that made his statements misleading, it

does allege that Marino and Moosa were aware.  The court
disagrees with the defendants' contention that the amended
complaint makes only "sweeping and conclusory allegations" that
Marino and Moosa "must have known" the facts giving rise to the
alleged fraud simply by virtue of their positions of authority or
simply because things ultimately turned out badly (i.e., fraud by
hindsight).  Rather, the amended complaint points to specific
circumstances which lead to a strong inference that Marino and
Moosa knew, at least as of September 28, 2006, that there were
material reasons for doubting the previous revenue projections.
Cf. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1224 (1st Cir.
1996) ("The plaintiffs provide a series of factual allegations
relating to a combination of developments known to the company .
. . that could have provided a basis for advance knowledge of the
information disclosed [nearly a month after the allegedly
misleading communication]."), superseded by statute as stated in
Greebel, 194 F.3d at 197.

     The temporal proximity of the September 28 presentation to
the end of the fiscal quarter (just two days before the end of
the quarter) and to the September 29 press release revealing
"disappointing" news, is itself "a circumstance potentially
bolstering the complaint's claims of fraud."  Id. at 1225.  More
importantly, statements made in the September 29 press release

24

and in the investor conference call later that day provide some circumstantial evidence indicating that the defendants had been aware that there were serious problems in the third quarter that would affect revenue for the quarter.

Language in the September 29 press release suggests that some of the negative information had been known to company officials for some time.  For example, the press release quoted Marino as stating that "[w]e effectively stopped sales of the Vector CtP product in the third quarter until we got our arms around certain manufacturing issues."  He also stated, hopefully, that "[w]e believe that the product improvements we have made will allow us to resume full Vector sales and return to growth in Q4 and into 2007."  Later that day, Marino admitted in the investor conference call that the revenue guidance provided during the Lammey's presentation the previous day "was an incorrect statement."  These statements suggest that a significant manufacturing problem came to light and was corrected, after halting sales of the Vector TX52, during the course of the third quarter.  In addition, it is highly unlikely that the other three factors cited in the September 29 press release first became known to Presstek's corporate officers after the September 28 presentation.  Taken in context, the September 29 admissions strongly suggest that company officials had

knowledge of material revenue-impacting problems before September 28.[3]

Such knowledge alone is sufficient to establish scienter. See Aldridge, 284 F.3d at 83 ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."); StockerYale, 453 F. Supp. 2d at 356-57 (finding scienter was adequately pled where the complaint alleged that the defendants knew that a "press release contained false or misleading information at the time it was issued").  Even if the defendants did not consciously intend to defraud, the allegation that they were aware of material issues that would likely affect Presstek's revenues for the third quarter is sufficient to establish that they "acted with a high degree of recklessness." StockerYale, 453 F. Supp. 2d at 357 (citing Aldridge, 284 F.3d at 82; Greebel, 194 F.3d at 198-201).

---

[3]The amended complaint alleges that a press release on October 25, 2006, confirmed that problems arose during the third quarter that affected revenues.  In that press release, Marino explained the poor third quarter performance as follows:

We experienced revenue declines in Q3 due to execution failures and other considerations that centered on several issues that arose during the quarter, including quality issues impacting CtP equipment and consumables sales, weaker than expected sales order activity in North America and from our OEM partners, as well as a larger than expected decline in our analog business.

This is not a case of "fraud by hindsight."  As the First
Circuit explained in <u>Aldridge</u>, fraud by hindsight "occurs when a
plaintiff simply contrast[s] a defendant's past optimism with
less favorable actual results, and then contend[s] that the
difference must be attributable to fraud."  <u>Id.</u> at 81 (internal
quotation marks omitted).  In this case, as in <u>Aldridge</u>, the
amended complaint alleges something more -- that the company
"failed to disclose certain known material information,"
information that negatively impacted upon the company's revenue
projections, and that the company "essentially admitted" to
knowing this information in subsequent corrective disclosures.
<u>Id.</u> at 82.

Although the defendants' competing inference -- that the
September 28 presentation was an honest mistake that they
promptly corrected with a press release -- is plausible, it is no
more compelling than the inference advocated by Sloman.[4]  Because
the inference of scienter is at least as compelling as the non-

_____

[4]It is arguable that the defendants' inference is less
convincing than Sloman's.  Having reviewed the September 29 press
release, which was attached to the defendants' reply brief, the
court notes that it does not purport to "correct" the
representations made in the September 28 presentation.  In fact,
the press release contains no mention of the September 28
presentation nor does it draw attention to the fact that its
projections contradict (and trump) the projections made one day
earlier in the presentation.

culpable inference, Sloman's amended complaint has sufficiently
pled scienter as to the September 28 presentation.

    With respect to the July 27 press release, the inference of
scienter is less compelling.  Although the September 29
admissions state that problems arose during the third quarter,
they do not suggest precisely when the problems became known.
Hypothetically, the problems could have arisen in August or early
September.  Alternatively, the defendants might have learned of
some of the issues in July, but may have believed, in good faith,
that the issues were minor or would be quickly resolved and would
not, therefore, materially impact revenues for the quarter.
Nevertheless, as noted above, see supra at 19, Sloman's section
10(b) claim does not rely on the July 27 press release.  Sloman
can prevail on his claim if he can establish that the defendants
are responsible for knowingly or recklessly publishing a false or
misleading statement on September 28.  Therefore, it is
unnecessary to consider whether the amended complaint states
facts giving rise to a strong inference of scienter as to the
July 27 press release.

    Because Sloman has pled sufficient facts to establish (1)
that the September 28 presentation was fraudulent or misleading,
and (2) that there is a strong inference that the defendants

28

acted with scienter with respect to that communication, the court must address the defendants' loss causation argument.

## D.  Pleading Loss Causation

The defendants argue that Sloman's amended complaint fails to allege facts establishing that the decline in Presstek's share price was caused by the defendants delayed disclosure.

A "causal connection between the material misrepresentation and the loss" is another element that must be proved by a plaintiff seeking damages under section 10(b).  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005) (citing 15 U.S.C. § 78u–4(b)(4)).  Simply alleging that the plaintiff purchased a security at an inflated price is not sufficient.  Id.  Rather, the plaintiff must adequately allege that the alleged misrepresentation, as opposed to some other factor, was the actual cause of the plaintiff's economic loss.  Id. at 343–46. In a case such as this, the plaintiff must allege facts sufficient to establish "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Tycom, 2005 WL 2127674, at *11 (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005)).

29

The allegation of loss causation is subject only to the liberal pleading standards of Rule 8(a)(2) of the Federal Rules of Civil Procedure.  <u>Dura</u>, 544 U.S. at 346.  Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  As the Supreme Court acknowledged, the "ordinary pleading rules are not meant to impose a great burden upon a plaintiff[,]" and, therefore, "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." <u>Id.</u> at 347.

In <u>Dura</u>, the Supreme Court found that the plaintiffs' complaint insufficiently pled loss causation because of its "failure to claim that [the defendant company's] share price fell significantly after the truth became known."  <u>Id.</u> at 347. Sloman's amended complaint does not suffer from that deficiency. The amended complaint alleges that Sloman, and the putative class, "in reliance on the integrity of the market, paid artificially inflated prices for Presstek common stock," and that Sloman and the class would not have purchased the stock at the inflated prices, if at all, had they "been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements."  Most importantly, it further

alleges that Sloman and the class "were damaged when the price of
Presstek stock fell when the true facts were disclosed."  The
amended complaint specifically alleges that the price of Presstek
stock dropped 20% between the close of trading on September 28
and the opening of trading on September 29, and that the
corrective disclosures were made public during the intervening
period.

The defendants attempt to muddy the waters by pointing out
that Presstek's stock began its decline on September 28.  They
argue that the heavy September 28 trading, before the September
29 press release and conference call, illustrates that it was not
the corrective disclosures that caused Presstek's price to
decline.  Sloman attempts to rebut the defendants by arguing that
the "suspicious" heavy trading on September 28 indicates that
there was a selective leak of the corrective information.  The
amended complaint's speculation of a selective leak, however, is
entirely unsubstantiated.  The amended complaint relies for this
claim solely on anonymous internet postings, which are themselves
merely speculative.

Nevertheless, the reasons behind the September 28 trading
are beside the point.  Even if Presstek's stock declined on
September 28 for reasons unrelated to this lawsuit, it would not
disprove, as a matter of law, that the overnight decline was not

attributable to the defendants' midnight corrective disclosure. The question of what caused the 20% overnight decline in value is a matter of proof that cannot be determined at this stage. See StockerYale, 453 F. Supp. 2d at 359 ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal."); Tycom, 2005 WL 2127674, at *13 (same).  Sloman's allegations of loss causation are sufficient to survive the defendants' motion to dismiss.

**E.  Section 20(a)**

The amended complaint alleges that the individual defendants, Marino and Moosa, are liable as "control persons" under section 20(a) for Presstek's violation of section 10(b). See Stone & Webster, 414 F.3d at 194.  The elements of a claim under section 20(a) are "(I) an underlying violation of the same chapter of the securities laws by the controlled entity, here [Presstek]; and (ii) control of the primary violator by the defendant."  Id. (citing 15 U.S.C. § 78t(a)).  The individual defendants argue that Sloman cannot satisfy either of the above elements.  Because the court has concluded that Sloman's section

10(b) claim survives the motion to dismiss, the argument that Sloman cannot satisfy the first element is unavailing.

Marino and Moosa argue alternatively that Sloman failed to sufficiently plead that they were "control persons" of Presstek with respect to the September 28 presentation.  Marino and Moosa assert that the section 20(a) claim should be dismissed because Sloman makes only boilerplate allegations that they "must have" exercised control over Presstek merely by virtue of their positions as executive officers of Presstek.  See Aldridge, 284 F.3d at 85 ("[T]he alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company.").  They also point out that there is no allegation that either Marino or Moosa had any direct role in the September 28 presentation.

The individual defendants' do not fairly characterize the allegations of the amended complaint; it does not rely solely on the positions held by Marino and Moosa.  Rather, the amended complaint alleges that Marino and Moosa "had direct involvement in the day-to-day operations" of Presstek.  Moreover, it alleges that, at least during the relevant time period, both of the individual defendants regularly provided much of the substance of Presstek's statements to the investing public.  Viewing the amended complaint as a whole, it alleges substantive involvement

33

by Marino and Moosa in the dissemination of the company's public statements.  Their historical involvement in the company's public relations, coupled with their positions as the top executive officers of the company, leads to the natural inference that they exercised control over statements made to the investing public. Cf. StockerYale, 453 F. Supp. 2d at 360.  That is all that is required at this stage.

### III.  Conclusion

For the foregoing reasons, the defendants' motion to dismiss the amended class action complaint (document no. 15) is denied.

SO ORDERED.

_Joseph A. DiClerico, Jr._
Joseph A. DiClerico, Jr.
United States District Judge

September 18, 2007

cc:  David Quinn Gacioch, Esquire
     Theodore M. Hess-Mahan, Esquire
     Michael D. Kendall, Esquire
     Mark L. Mallory, Esquire
     Robert E. McDaniel, Esquire
     Thomas G. Shapiro, Esquire
     Matthew L. Tuccillo, Esquire